

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-8-2005

# Richardson v. PA Bd Probation

Precedential or Non-Precedential: Precedential

Docket No. 04-2026

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Richardson v. PA Bd Probation" (2005). *2005 Decisions.* Paper 488.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/488

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

NO. 04-2026

_____

WILBUR RICHARDSON

*Appellant*

v.

PENNSYLVANIA BOARD OF PROBATION AND PAROLE;
ATTORNEY GENERAL OF PENNSYLVANIA

_____

On Appeal From the United States District Court
For the Middle District of Pennsylvania
(D.C. No. 04-CV-0085)
District Judge: Honorable Malcolm Muir

_____


Argued: July 12, 2005
Before: ALITO, BECKER, and GREENBERG *Circuit Judges*.

(Filed: September 8, 2005)

R. DAMIEN SCHORR (Argued)
1015 Irwin Drive
Pittsburgh, PA 15236
        *Attorney for Appellant*

THOMAS W. CORBETT, JR.
Attorney General
JOHN G. KNORR, III (Argued)

Chief Deputy Attorney General
SARAH C. YERGER
Senior Deputy Attorney General
Office of the Attorney General
15th Floor, Strawberry Square
Harrisburg, PA 17120
　　　*Attorneys for Appellees*

_____

OPINION OF THE COURT
____

BECKER, *Circuit Judge*.

Wilbur Richardson filed a petition for habeas corpus claiming that the Pennsylvania Board of Probation and Parole ("the Parole Board") has continually denied him parole in violation of the Ex Post Facto Clause of the United States Constitution. Richardson asserts that, in rejecting his parole application, the Parole Board retroactively applied 1996 amendments to the Pennsylvania Probation and Parole Act, Pa. Stat. Ann., tit. 61, §§ 331.1-331.34a (West 1999) ("Parole Act"). Richardson relies on our decision in *Mickens-Thomas v. Vaughn*, 321 F.3d 374 (3d Cir. 2003), in which we found that the use of the 1996 Amendments to deny a petitioner parole violated the Ex Post Facto Clause.

The Commonwealth, however, contends that *Mickens-Thomas* does not control because the Pennsylvania Supreme Court held in *Winklespecht v. Pennsylvania Board of Probation and Parole*, 813 A.2d 688 (Pa. 2002), that the 1996 Amendments did not in fact change the substantive criteria for parole. Unlike Thomas, Richardson was denied parole at least twice after *Winklespecht* was decided. However, the Pennsylvania Supreme Court's more recent decision in *Cimaszewski v. Board of Probation and Parole*, 868 A.2nd 416, 426-27 (Pa. 2005), undermines this interpretation of *Winklespecht*. Given *Cimaszewski*, *Mickens-Thomas* appears to have retained vitality. Nevertheless, Richardson has failed to state a claim for relief. To be eligible for habeas corpus based on a violation of the Ex Post

2

Facto Clause, a petitioner must show *both* a retroactive change in law or policy *and* that this change caused individual disadvantage by creating "a significant risk of increasing his punishment." *Garner v. Jones*, 529 U.S. 244, 255 (2000); *Mickens-Thomas*, 321 F.3d at 393. Richardson has not demonstrated that he was disadvantaged by the use of the 1996 Amendments in his parole determination. Therefore, we will deny his request to order the District Court to conduct an evidentiary hearing, and we will affirm the order of the District Court denying his petition for habeas corpus.

## I. Factual and Procedural Background

### A. Parole in Pennsylvania

Parole decisions in Pennsylvania are governed by the Parole Act, Pa. Stat. Ann., tit. 61, §§ 331.1-331.34a. Once a prisoner has served his or her minimum sentence, the prisoner is eligible for parole. *Id.* § 331.21(a). The Parole Board has the "exclusive power to parole and reparole" prisoners sentenced to two or more years of imprisonment. *Id.* § 331.17. To determine a prisoner's eligibility, the Parole Act directs the Board to consider, *inter alia*, the prisoner's complete criminal record, conduct while in prison, "physical, mental, and behavior condition and history," the "nature and circumstances of the offense committed," and "the general character and background of the prisoner." *Id.* § 331.19.

To further aid its analysis, the Parole Board also looks to Pennsylvania's Parole Decision Making Guidelines ("the Parole Guidelines"), which provide a prediction of the likelihood of parole by assigning a numerical value to certain criteria, based on past patterns of recidivism and an assessment of risk to the community. *See Mickens-Thomas*, 321 F.3d at 378-79. The Parole Guidelines include a worksheet and a formal numerical protocol: the higher the numerical score, the less likely a petitioner is to be granted parole.[1]

---

[1]Prior to 1996, approximately twenty percent of parole decisions were contrary to the Parole Guidelines' recommendation. Departures from the Guidelines required a written explanation to

These considerations, however, are not binding, as the Parole Act confers complete discretion on the Parole Board to make the ultimate parole determination. *Id.* § 331.21; *see also Rogers v. Pa. Bd. of Prob. & Parole*, 724 A.2d 319, 322 (Pa. 1999) ("[T]he General Assembly, in its wisdom, has conferred upon the Parole Board sole discretion to determine whether a prisoner is sufficiently rehabilitated to serve the remainder of his sentence outside of the confines of prison . . . ."). Thus parole decisions in Pennsylvania are generally not subject to judicial review unless the petitioner asserts a constitutional challenge to the denial of parole or seeks a writ of mandamus to compel the Parole Board to exercise its discretion. *See Coady v. Vaughn*, 770 A.2d 287, 290 (Pa. 2001) ("Where . . . discretionary actions and criteria are not being contested . . . an action for mandamus remains viable as a means for examining whether statutory requirements have been altered in a manner that violates the Ex Post Facto Clause . . . . Absent a change in the statutes governing parole, however, denial of parole would generally constitute a discretionary matter that is not subject to review.").

Section 1 of the Parole Act contains a general statement of the policy and philosophy of the Pennsylvania parole system. From its enactment in 1941 until 1996, Section 1 emphasized the values of rehabilitation and restoration to social and economic life, by providing the following statement of parole policy:

> The value of parole as a disciplinary and corrective influence and process is hereby recognized, and it is declared to be the public policy of this Commonwealth that persons subject or sentenced to imprisonment for crime shall, on release therefrom, be subjected to a period of parole during which their rehabilitation, adjustment, and

---

explain the policy exception, usually with reference to certain non-guidelines factors such as psychotic behavior, patterns of habitual offense, or the recommendation of the Department of Corrections. *Id.* at 379. The Parole Guidelines continued to be employed after 1996, although the rate of departure in parole decision-making after 1996 is not clear from the record.

4

restoration to social and economic life and activities shall be aided and facilitated by guidance and supervision under a competent and efficient parole administration, and to that end it is the intent of this act to create a uniform and exclusive system for the administration of parole in this Commonwealth.

Act of August 6, 1941, P. L. 861 § 1, *formerly codified at* Pa. Stat. Ann., tit. 61, § 331.1 (1995) (hereinafter, "the pre-1996 Parole Act").

In 1996, the Parole Act was modified to make public safety the primary consideration. *See* Act of December 18, 1996, P.L. 1098, No. 164 §1. The policy statement under the amended Parole Act reads as follows:

The parole system provides several benefits to the criminal justice system, including the provision of adequate supervision of the offender while protecting the public, the opportunity for the offender to become a useful member of society and the diversion of appropriate offenders from prison.

In providing these benefits to the criminal justice system, the board shall first and foremost seek to protect the safety of the public. In addition to this goal, the board shall address input by crime victims and assist in the fair administration of justice by ensuring the custody, control and treatment of paroled offenders.

Act of December 18, 1996, P.L. 1098, No. 164 § 1 *codified at* Pa. Stat. Ann., tit. 61, §331.1 (2005) (hereinafter, "the 1996 Amendments").

*B. Richardson's Parole History*

In 1984, Richardson was convicted in the Court of Common Pleas of Philadelphia County of third degree murder and was sentenced to 14-30 years imprisonment. Richardson has been denied parole each time he was considered between 1997 and 2003. Richardson was first denied parole in 1997. The 1997 parole

5

determination was made on December 12, 1996, before the effective date of the 1996 Amendments, and thus fell under the pre-1996 Parole Act. The Board cited several reasons for the denial, including that the instant offense was assaultive, involved a weapon, and caused injury to the victim; Richardson's "need for counseling and treatment"; and the unfavorable recommendation of the Department of Corrections. The Parole Board stated that it would consider in his next parole determination whether Richardson participated in the prison's "prescriptive program plan," maintained a good conduct record, and earned institutional recommendation for parole.

The corrections staff of State Correction Institution Dallas, where Richardson was being held, first recommended Richardson for parole in 1998, and continued to recommend Richardson for parole each subsequent year. Notwithstanding these recommendations, the Parole Board continued to deny parole. The 1998 parole decision stated the same reasons as the 1997 decision, except that the 1998 decision added "habitual offender" as a new reason, and deleted "unfavorable recommendation from the Department of Corrections" as a rationale.

In 1999 and 2000, the parole decision on Richardson changed format in a manner that echoed the language of the 1996 Amendments to the Parole Act. These decisions stated:

> The Pennsylvania Board of Probation and Parole has determined that the mandates to protect the safety of the public and to assist in the fair administration of justice cannot be achieved through your release on parole.

In 2001 and 2002, the statement of reasons no longer mentioned the safety of the public and was limited to the terse conclusion: "[T]he fair administration of justice cannot be achieved through your release on parole. You are therefore refused parole . . . ." Each year the Parole Board suggested the same considerations for the next parole determination as had been given in 1998.

The Parole Board issued a modification of the 2002

6

decision several months after the original decision.[2]  The new version of the 2002 decision stated:

> Following an interview with you and a review of your file, and having considered all matters required pursuant to the Parole Act of 1941, as amended, 61 P.S. § 331.1 *et seq.*, the Board . . . . in the exercise of its discretion, has determined at this time that: your best interests do not justify or require you being paroled/reparoled; and the interests of the Commonwealth will be injured if you were paroled/reparoled.  Therefore you are refused parole/reparole at this time.  The reasons for the board's decision include the following:
>
>> The recommendation of the prosecuting attorney.
>>
>> Reports, evaluations and assessments concerning your physical, mental, and behavior condition and history.
>>
>> Other factors deemed pertinent in determining that you should not be paroled: your prior criminal record.

The 2003 parole decision was identical to the modified 2002 decision except that two additional reasons were added:

> Your version of the nature and circumstances of the offense(s) committed.

---

[2]It is not clear from the record why the Parole Board modified the decision, although the more expansive parole decision appears to be due to a system-wide change rather than anything particular to Richardson's case. *Cf. Voss v. Pennsylvania Bd. Prob. & Parole*, 788 A.2d 1107 (Pa. Commw. Ct. 2001) (holding that the generic "fair administration of justice" language did not meet due process requirements as a matter of Pennsylvania law).

Your refusal to accept responsibility for the offense(s) committed.

In 2003, Richardson petitioned for a writ of mandamus in the Commonwealth Court of Pennsylvania, arguing that the parole decisions violated the Ex Post Facto Clause of the United States Constitution. The Commonwealth Court denied mandamus in an unpublished order, and the Pennsylvania Supreme Court affirmed without opinion. *Richardson v. Pa. Bd. of Prob. & Parole*, 838 A.2d 650 (2003). Richardson then filed this petition for a writ of habeas corpus in the District Court for the Middle District of Pennsylvania. The Court denied his petition.

The Court held that a prisoner carries "the ultimate burden of establishing that the measure of punishment itself has changed," *Garner*, 529 U.S. at 255, and "must show that as applied to his own sentence the law creates a significant risk of increasing his punishment," *Calif. Dep't of Corr. v. Morales*, 514 U.S. 499, 510 n.6 (1995). The Court then found that Richardson had failed to establish that the 1996 Amendments affected the Parole Board's decision. The Court stated that its "review of the documents in this case confirms that there is no language in the Board's decision implicating the amendments cited in Richardson's petition, and Richardson has not demonstrated the role which those amendments played in the Board's decision." Therefore, the Court denied Richardson's petition because it concluded that "the Ex Post Facto claim in [Richardson's habeas petition] is based on speculation and conjecture. Richardson has failed to link the one amended statute cited in connection with his first claim to the Board's decision."[3]

## II. The Ex Post Facto Clause

---

[3]The District Court had jurisdiction over Richardson's habeas petition pursuant to 28 U.S.C. § 2254. Richardson timely appealed the District Court's order denying his petition, and we have appellate jurisdiction pursuant to 28 U.S.C. § 1291. Given that the District Court denied Richardson's habeas petition without holding an evidentiary hearing, we exercise plenary review. *Zettlemoyer v. Fulcomer*, 923 F.2d 284, 291 (3d Cir. 1991).

8

The Ex Post Facto Clause states that "[n]o State shall . . . pass any . . . ex post facto Law." U.S. Const. art. I, § 10, cl.1. The Clause applies to a statute or policy change which "alters the definition of criminal conduct or increases the penalty by which a crime is punishable." *Morales*, 514 U.S. at 506 n.3.

The ex post facto inquiry has two prongs: (1) whether there was a change in the law or policy which has been given retrospective effect, and (2) whether the offender was disadvantaged by the change. *See Weaver v. Graham*, 450 U.S. 24, 29 (1981). To violate the Ex Post Facto Clause, a retroactive change in the law or policy must create a "sufficient risk of increasing the measure of punishment attached to the covered crimes"; a "speculative and attenuated possibility of . . . increasing the measure of punishment" is not enough. *Morales*, 514 U.S. at 509.

In *Garner*, the Supreme Court noted that "[r]etroactive changes in laws governing parole of prisoners, in some instances, may be violative of [the Ex Post Facto Clause]." 529 U.S. at 250. The Court, however, acknowledged the inherent difficulty in deciding whether a retroactive change to parole policy constitutes an Ex Post Facto violation, particularly considering the discretion generally afforded to parole boards in making the ultimate parole determination. *Id.* The Court made clear that "[t]he presence of discretion does not displace the protections of the *Ex Post Facto* Clause" and acknowledged the "danger that legislatures might disfavor certain persons after the fact is present even in the parole context." *Id.* at 253.

The Court nonetheless has afforded states some measure of flexibility in making changes to their parole policy, and thus has been "careful . . . not to adopt a single formula for identifying which legislative adjustments, in matters bearing on parole, would survive an *ex post facto* challenge." *Id.* at 252. Informing this flexibility is the Court's observation that

> discretion, by its very definition, is subject to changes in the manner in which it is informed and then exercised. The idea of discretion is that it has the capacity, and the obligation, to change and adapt based on experience. New insights into the accuracy of predictions about the offense and the risk of

9

recidivism consequent upon the offender's release, along with a complex of other factors, will inform parole decisions.

*Id.* at 253. Therefore, the Court cautioned that "the *Ex Post Facto* Clause should not be employed for 'the micromanagement of an endless array of legislative adjustments to parole and sentencing procedures'"; *id.* at 252 (quoting *Morales*, 514 U.S. at 508), and that "[t]he States must have due flexibility in formulating parole procedures and addressing problems associated with confinement and release." *Id.*

## III. *Mickens-Thomas v. Vaughn*

In *Mickens-Thomas v. Vaughn*, 321 F.3d 374 (3d Cir. 2003), we considered whether the 1996 Amendments to the Pennsylvania Parole Act violated the Ex Post Facto Clause. The petitioner, Louis Mickens-Thomas ("Thomas"), was one of the unusual prisoners who received a commutation of his life sentence, which rendered him eligible for parole in 1996. Of the 266 prisoners whose life sentences had ever been commuted in Pennsylvania, Thomas was the only prisoner not to be granted parole. Thomas petitioned for habeas relief arguing that the Parole Board denied him parole based on the 1996 Amendments to the Parole Act in violation of the Ex Post Facto Clause.

The Parole Board argued in *Mickens-Thomas* (as here) that "the 1996 amendments . . . did not change the Board's standards for determining parole." 321 F.3d at 384 (alteration in original). We disagreed and found that the "statute unequivocally has been interpreted by the Pennsylvania courts to express broad and general aspirations of Pennsylvania's parole policy." *Id.* (citing *Stewart v. Pa. Bd. of Prob. & Parole*, 714 A.2d 502, 508 (Pa. Commw. Ct. 1998)). We did not rely on the then-recently decided case of *Winklespecht v. Pennsylvania Board of Probation and Parole*, 813 A.2d 688 (Pa. 2002), because *Winklespecht* was decided "*after* the Board's actions on Thomas's parole" and therefore "came too late to alter the Board's view of the statutory amendment on the outcome of this case." 321 F.3d at 391 (emphasis in original).

In *Mickens-Thomas,* we held that the question is "not

10

whether the statute on its face pertains to parole decisionmaking, but whether, *in practice*, the new language has altered the fundament for reviewing parole applications." *Id.* at 384 (emphasis original). We concluded that there was "significant evidence" that the practical effect of the 1996 Amendments was to change the weight that public safety was given in the parole calculation. *Id.* at 387. Even though the Board had always used public safety as one consideration in parole determinations, we found that, after 1996, the Board gave public safety far greater weight. *Id.* at 385. This change particularly affected the chances of parole for violent offenders, who are subjected to "a more stringent standard of review" than under the pre-1996 scheme. *Id.* (quoting *Myers v. Ridge*, 712 A.2d 791, 799 (Pa. Commw. Ct. 1998)).

Having found that the 1996 Amendments made a change in Pennsylvania parole policy as a general matter, we turned to Thomas's specific case, and held that Thomas also met the second prong of the ex post facto analysis—that the change in policy adversely affected his parole decision. The panel found that "there is significant evidence that [the Board] acted upon policies that were established after Thomas's crime and conviction," mainly because of the Board's reliance on  public safety, in denying Thomas parole. *Id.* at 387. Central to this determination were the many pre-1996 factors that pointed toward a grant of parole, such as the Parole Guidelines score, the unanimous recommendation of the Department of Corrections, and, importantly, the fact that all 265 prisoners whose life sentences were commuted prior to 1996 had been paroled. *Id.* at 387-88.

Given the foregoing analysis, we had no difficulty finding that the 1996 Amendments "substantially increased the period of incarceration" by reducing the possibility of Thomas's release on parole. *Id.* at 392. We therefore held that "to retroactively apply changes in the parole laws made after conviction for a life sentence in Pennsylvania that adversely affect the release of prisoners whose sentences have been commuted, violates the Ex Post Facto Clause." *Id.* at 393.

## IV.  New Law or Policy

*Mickens-Thomas* concluded that the "practical effect" of the

11

1996 Amendments was to create a more "a more stringent standard of review," particularly for the parole of violent offenders. 321 F.3d at 385 (quoting *Myers*, 712 A.2d at 799). However, shortly before *Mickens-Thomas* was filed, a plurality of the Pennsylvania Supreme Court held that while

> the language concerning 'protecting the safety of the public' and 'assist[ing] in the fair administration of justice' was added to § 331.1 in 1996, these concepts are nothing new to the parole process and have always been underlying concerns. Both versions of § 311.1 leave the decision regarding the grant of parole within the discretion of the Board; the fact that some language was added in 1996, which clarified the policy underlying the parole process, does nothing that increase Winklespecht's punishment.

Winklespecht, 813 A.2d at 692 (alteration in original). Therefore, *Winklespecht* concluded that the 1996 Amendments to the Parole Act "[do] not create a substantial risk that parole would be denied any more frequently than under the previous wording" and thus held that the retrospective application of the 1996 Amendments does not violate the Ex Post Facto Clause. *Id.* at 691-92.

The Commonwealth argues that, after *Winklespecht*, it was clear that the 1996 Amendments did not establish a new law or policy. Without a change in law or policy, the Commonwealth claims that the first prong of the ex post facto inquiry is not satisfied. Thus, the Commonwealth asserts that the applicability of *Mickens-Thomas* is limited to those parole decisions made under the Parole Board's pre-*Winklespecht* understanding of the 1996 Amendments.

*Mickens-Thomas* did not consider the impact of *Winklespecht* because *Winklespecht* was handed down in December 2002—after Thomas' 1996, 1998, and 2000 denials of parole. In contrast, the Parole Board has twice denied Richardson parole *after Winklespecht*, in decisions that were ostensibly informed by the Pennsylvania Supreme Court's holding that there was no substantive change in policy wrought by the 1996 Amendments. Thus, the Commonwealth claims that *Mickens-*

12

*Thomas* does not control and that no Ex Post Facto violation has occurred.

The Commonwealth, however, ignores subsequent Pennsylvania Supreme Court decisions that undermine its interpretation of *Winklespecht*. In *Finnegan v. Pennsylvania Board of Probation and Parole*, 838 A.2d 684, 688 (Pa. 2003), a majority of the Pennsylvania Supreme Court reaffirmed that the considerations of public safety and administration of justice "have always been underlying concerns" of the Act and that the new language merely "clarified the policy underlying the parole process." Still, given the disparities between *Mickens-Thomas* and *Finnegan*, doubts remained about whether the use of the amended Parole Act violated the Ex Post Facto Clause. The Pennsylvania Supreme Court again addressed the issue in *Hall v. Pennsylvania Board of Probation and Parole*, 851 A.2d 859 (Pa. 2004). This time a plurality of the Court reaffirmed that the use of the 1996 amended criteria does not violate the Ex Post Facto Clause.

Chief Justice Cappy dissented in *Hall*, claiming that the majority had improperly disregarded the U.S. Supreme Court precedents of *Garner*, 529 U.S. 244, and *Morales*, 514 U.S. 499, which both established that retroactive changes to parole regulations *may* violate the Ex Post Facto Clause if the practical effect of the change creates a significant risk of increased punishment. 851 A.2d at 865-69 (Cappy, C.J., dissenting). Chief Justice Cappy endorsed an "as applied" analysis of ex post facto challenges to the 1996 Amendments, seeing the inquiry as a "question of proof" whereby each prisoner must "demonstrate that a violation has occurred, and that he in fact faces a significant risk of an increase in punishment by application of the new policy." *Id.* at 869.

On February 24, 2005, the Pennsylvania Supreme Court made an about-face along the lines of Chief Justice Cappy's dissent, and held in *Cimaszewski*, 868 A.2d at 426-27, that under the U.S. Supreme Court decisions of *Morales* and *Garner,* "retroactive changes in the law governing parole *may* violate the *ex post facto* clause." *Cimaszewski* dispelled any suggestion that *Winklespecht* had interpreted the 1996 amendments as making no substantive change in the criteria for parole. *Cimaszewski* also quoted *Garner* for the proposition that "[w]hen the rule does not by its own terms show a significant risk" of increased

incarceration, a petitioner must prove that the rule's "practical implementation . . . will result in a longer period of incarceration than under the earlier rule." 868 A.2d at 427 (quoting *Garner*, 529 U.S. at 255). It added that this is a "fact-intensive inquiry" to be conducted "on an individual basis." *Id.* This approach parallels that taken by our Court in *Mickens-Thomas*.

Under *Cimaszewski*, in order to establish an ex post facto violation, the petitioner must provide "the requisite evidence that he faces a significant risk of an increase in punishment" by showing that "under the pre-1996 Parole Act, the Board would likely have paroled the inmate." *Id. Cimaszewski* held it was not sufficient for a petitioner merely to rely on the same statistics cited in *Mickens-Thomas*, because the petitioner must establish the effect of the amendments "when applied to him."[4] *Id.* at 428.

We therefore conclude that the State's reliance on *Winklespecht* is undermined by *Cimaszewski*, which acknowledged that the practical effect of the amendment *may* be that it increases an individual prisoner's sentence. Given this conclusion in *Cimaszewski*, and informed by our own precedent in *Mickens-Thomas*, we hold that the first prong of the ex post facto inquiry is satisfied.

## V. Individual Disadvantage

Richardson argues that, under *Mickens-Thomas*, the retroactive application of the 1996 Amendments is a *per se* violation of the Ex Post Facto Clause, and that he should

---

[4]The Pennsylvania Supreme Court is, of course, the final arbiter of Pennsylvania law. Nevertheless, it may be the case that the practical effect of a law or policy differs from the judicial interpretation. *See Mickens-Thomas*, 321 F.3d at 384. In such a case, we leave open the possibility that an ex post facto violation can be found if the Parole Board continues to apply a more stringent standard for parole determinations, notwithstanding the admonitions of the state's highest court. In this respect, if we were presented with evidence that a stricter standard of review continues to prevail, *Cimaszewski* may not have been necessary to our finding that *Mickens-Thomas* retains vitality post-*Winklespecht*.

automatically be entitled to relief if he can demonstrate that the Parole Board relied on the amended version of the Parole Act. This argument, however, is in tension with the second prong of the ex post facto analysis: the requirement that the change in the law "disadvantage the offender affected by it." *Weaver v. Graham*, 450 U.S. at 29; *see also Garner*, 529 U.S. at 255 (requiring a prisoner to show that "as applied *to his own sentence* the law created a significant risk of increasing *his* punishment") (emphasis added). While the "general operation of the . . . parole system may produce relevant evidence and inform further analysis," *Garner*, 529 U.S. at 255, the ultimate question is the effect of the change in parole standards on the individual's risk of increased punishment.

*Mickens-Thomas* is fully in accord with this approach. In *Mickens-Thomas*, we explicitly required Thomas to demonstrate not only that the new policy applied retroactively, but also that Thomas was disadvantaged as a result. *See* 321 F.3d at 384. We found that the key question is whether "the change affected the petitioner's *own* sentence detrimentally." *Id.* at 393 (emphasis original). Indeed, the second half of the *Mickens-Thomas* opinion is largely devoted to establishing that Thomas would have likely been paroled under the pre-1996 standards, but was denied parole only because of the new focus on public safety under the 1996 Amendments. As noted above, Thomas produced statistical evidence specific to his case, including the fact that out of 266 prisoners whose life sentence was commuted in the recorded history of the Parole Board, he was the sole individual whose parole was denied.

Thomas also showed that the Parole Guidelines counseled in favor of parole, and that the Department of Corrections staff had unanimously recommended him for parole. In addition, Thomas pointed to the rationale given by the Parole Board for denying him parole, from which we inferred that the change in policy after the 1996 Amendments had a significant, if not determinative, effect on Thomas's denial of parole. *See* 321 F.3d at 390-91. It is therefore clear that *Mickens-Thomas* did not establish a *per se* rule, but rather, in line with the Supreme Court precedents of *Weaver*, *Garner*, and *Morales*, required Thomas to show he was individually disadvantaged by the 1996 Amendments.

The District Court denied Richardson's habeas petition

15

because he failed to demonstrate that the 1996 amendments negatively affected his parole determination. The Court concluded "there is no language in the Board's decision implicating the amendments . . . and Richardson has not demonstrated the role which those amendments played in the Board's decision."

The District Court overstated the case by finding that there is "no language" in the Parole Board's decision that implicates the 1996 Amendments. It is plain from each of Richardson's denials of parole between 1999 and 2003 that the Board *did* rely on the amended Parole Act in making its determination. In 1999 and 2000, the denial of parole mirrored the language of the 1996 Amendments, and justified Richardson's parole denial on the basis of "mandates to protect the safety of the public and to assist in the fair administration of justice." In 2001, the denial took out the public safety language but stated that "the fair administration of justice cannot be achieved through your release on parole." In 2002 and 2003, the parole decision specified that its denial was based on a consideration of "all matters required pursuant to the Parole Act of 1941, as amended, 61 P.S. § 331.1 *et seq.*"

Nevertheless, it is not sufficient for a prisoner to show that the Board relied on a new law or policy. Rather, he must also adduce some evidence that this new law or policy disadvantaged him by creating "a significant risk of increasing his punishment."[5] *Garner*, 529 U.S. at 255. We acknowledge the intuitive force of the argument that adjudication under stricter standards is more likely to lead to an adverse result. And we recognize that it may be difficult for a prisoner to adduce evidence of disadvantage, particularly since, prior to 2001, the Parole Board did not need to give a detailed statement of reasons for denial of parole.[6] But the

---

[5] We note that *Cimaszewski* suggested that a prisoner must show that he or she "would have been released *but for* the 1996 amendment" and "bears the burden of pleading and proving that under the pre-1996 Parole Act, he would have been paroled, while under the 1996 amendment he has not been paroled." 868 A.2d at 428 (emphasis added). This "but for" standard, however, has no basis in federal ex post facto law.

[6] In 2001, however, the Pennsylvania Commonwealth Court held in *Voss*, 788 A.2d 1107, that the generic rationale for denial

16

evidentiary requirement of the jurisprudence must be honored. For example, a petitioner might compare the parole rates for prisoners with similar convictions before and after the 1996 Amendments, state whether the Parole Guidelines would indicate that the petitioner was a good parole candidate, or draw inferences from the statement of reasons provided by the Parole Board regarding the criteria used for the parole determination in that individual's case. Richardson has not provided any such evidence of disadvantage as a result of the 1996 Amendments.

In this respect, Richardson's case is distinguishable from *Mickens-Thomas*. We summarize our findings there: (1) We found that the Parole Board relied solely on public safety in denying Thomas parole, while disregarding the Parole Guidelines, the unanimous recommendations of the Department of Corrections, and the evidence of Thomas's rehabilitation; (2) Thomas presented convincing evidence that he had a significant likelihood of parole under the pre-1996 guidelines, but was denied parole under the new policy; and (3) Thomas was able to show that *all* prisoners whose life sentences had been commuted prior to 1996 had been subsequently paroled.

*Mickens-Thomas* may be an exceptional case because of the compelling nature of the evidence of prejudice. We do not require a petitioner to muster evidence of such convincing quality, particularly in the absence of an evidentiary hearing. Nevertheless, our precedents require that a petitioner proffer at least *some* evidence of disadvantage to warrant habeas relief.

Richardson was convicted of third degree murder and sentenced to 14 to 30 years. He has not provided any evidence of the rate of parole for similarly situated prisoners before and after the 1996 Amendments. He also has not shown, as Thomas did, whether the Parole Guidelines, which were developed prior to 1996, would have recommended parole. Indeed, Richardson was first denied parole on December 12, 1996, *before* the effective date of the 1996 Amendments, and the Board cited the assaultive nature of Richardson's offense, the injury to the victim, the use of a

_____

of a prisoner's parole application, "the Fair Administration of Justice cannot be achieved through your release on parole," did not meet due process requirements as a matter of Pennsylvania law.

17

weapon, and Richardson's need for counseling and treatment as reasons for the denial. Similar reasons appear in the post-1996 denials.

In 2002, the reasons given for denying Richardson parole were the recommendation of the prosecuting attorney, reports, evaluations and assessments of his physical, mental, and behavior condition and history, and his prior criminal record. In 2003, the Parole Board added Richardson's refusal to accept responsibility for the offense committed to the list of reasons for denial. While public safety appears to have been one factor in the denial of Richardson's parole, it is hard to infer from these general statements the degree to which the 1996 Amendments impacted Richardson's parole determination.

Richardson claims that, at the very least, the District Court should be required to hold an evidentiary hearing to allow him to develop the record on whether the 1996 Amendments prejudiced his case. We agree with the District Court, however, that Richardson has thus far provided no evidence, and for that matter, has proffered no allegations, that a "significant risk" of increased punishment was created by the application of the 1996 Amendments to his individual case. We will not order an evidentiary hearing without allegations that state a claim for habeas relief. *See Townsend v. Sain,* 372 U.S. 293, 312 (1963) ("[T]he federal court to which the application is made has the power to receive evidence and try the facts anew" whenever "an applicant for a writ of habeas corpus alleges facts which, if proved, would entitle him to relief"); *Procunier v. Atchley*, 400 U.S. 446, 452 (1971) (requiring a District Court "to make the threshold determination that the respondent would be entitled to relief if his allegations were believed" before granting an evidentiary hearing); *see also* 28 U.S.C. § 2254(e)(2).

Because Richardson has failed to make any showing (or proffer) that he was individually disadvantaged by the retroactive application of the 1996 Amendments, we conclude that he has not established an ex post facto violation. We will therefore affirm the order of the District Court denying Richardson's petition for habeas corpus.

18